**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | |
| **ARTHUR DOUGLAS STEWART and** | : | **Bankruptcy No.  10-26939JAD** |
| **CHRISTINE ANN STEWART,** | : | |
| | : | |
| Debtors. | : | Chapter <u>13</u> |
| ———————————————— | X | |
| | : | |
| **ARTHUR DOUGLAS STEWART and** | : | **Doc. No. <u>65</u>** |
| **CHRISTINE ANN STEWART,** | : | |
| | : | |
| Movants, | : | |
| v. | : | |
| | : | |
| **JPMORGAN CHASE BANK, N.A., et al.,** | : | |
| | : | |
| Respondents. | : | |
| ———————————————— | X | |
| | : | |
| **ARTHUR DOUGLAS STEWART and** | : | **Adversary No. <u>10-2654JAD</u>** |
| **CHRISTINE ANN STEWART,** | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | **Doc. Nos. <u>17</u>, <u>19</u>, <u>39</u>, <u>50</u>** |
| | : | |
| **CHASE BANK and ARCHER LAND** | : | |
| **SETTLEMENT SERVICES,** | : | |
| | : | |
| Defendants. | : | |
| ———————————————— | X | |

## <u>MEMORANDUM OPINION</u>

The primary matter before the Court is *Defendant JPMorgan Chase Bank, N.A.'s
Motion to Dismiss Plaintiffs' Complaint* (the "*Motion to Dismiss*"), seeking dismissal of all but
two Counts asserted in the adversary complaint filed on December 24, 2010 (the
"*Complaint*").  Also before the Court is a *Motion to Request Derivative Standing to Exercise
Trustee's Powers Under §§ 544, 547, and 548 Nunc Pro Tunc* (the "*Motion for Derivative
Standing*") filed by Douglas and Christine Stewart (the "Debtors" or "Plaintiffs") in support
of Count IV alleged in the *Complaint*, and motion to strike filed in response thereto by the
chapter 13 trustee (the "Trustee").  For the reasons set forth below this Court will grant
the *Motion to Dismiss* in its entirety.  The Court will also grant the Trustee's motion to

00007488.WPD

strike the *Motion for Derivative Standing* in the adversary proceeding, and deny the relief requested by the Debtors therein.

## I.  Facts Alleged

For the purpose of evaluating the *Motion to Dismiss*, the Court will take the following allegations as true.  The Debtors reside at 102 Magnolia Drive, Greensburg, Pennsylvania (the "Property").  In response to a flyer, the Debtors contacted Ace Mortgage Holdings LLC, ("Ace") and completed a telephone application for mortgage refinancing. (Adv. No. 10-2654, Doc. #1, *Complaint*, ¶¶ 18, 27).[1]  Upon contacting Ace, the Debtors were allegedly promised a monthly payment which excluded escrow amounts for taxes and homeowners insurance. (Id. ¶ 28).

In connection with the refinancing, Ace retained Arthur Trexler d/b/a Norwin Appraisal Services ("Trexler") to complete an appraisal of the Property.  (Id. ¶¶ 19, 35, 37). The original appraisal figure was $345,000.  (Id. ¶ 38).  The refinancing could not be completed based on this appraisal figure, so the agents and employees of Ace allegedly pressured Trexler to increase the appraisal figure to $363,000.  (Id. ¶¶ 39-41).

As a result of the Debtors' application and the revised appraisal figure, the Debtors and Ace closed on a refinancing of the Debtors' existing mortgage on or about October 26, 2007 (the "Refinancing").  (Id. ¶¶ 21, 29, 42).  The Refinancing provided the Debtors with the funds intended to satisfy their prior mortgage obligation on the Property (the "Loan"). (Id. ¶ 21).  A promissory note evidencing the Loan amount of $352,110 and mortgage were issued on the Property.  (See id. ¶ 44, Exhibits "E" and "AF").  Washington Mutual Bank ("WaMu") was the named originator of the Loan.  (Id. ¶ 44, Exhibit "E").  The Debtors

---

[1] All future docket citations refer to Adversary Number 10-02654-JAD, unless otherwise specifically noted.

protested to Ace that they could not afford the contemplated repayment amount, but were allegedly assured that they would be permitted to refinance again in the future. (Id. ¶ 30).

Archer Land Settlement Services ("Archer") then prepared a HUD-1 Settlement Statement. (Id. ¶¶ 20, 43). This HUD-1 included a yield spread premium of $10,563.13 as part of the amount financed, and failed to disclose the cost of the private mortgage insurance. (Id. ¶¶ 46-49). Additionally, WaMu allegedly provided a "kickback" to Ace in the form of the yield spread premium in connection with the Refinancing. (Id. at ¶ 58). Ace subsequently shared the proceeds of this kickback with other entities listed on the HUD-1 form. (Id.). The HUD-1 provided to the Debtors was allegedly not the same HUD-1 provided to WaMu to consummate the Refinancing. (Id. ¶¶ 56-58, 100).

On September 25, 2008, the Office of Thrift Supervision appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver for WaMu.[2] (Id. ¶¶ 12-13). That same day, JPMorgan Chase Bank, N.A. ("JPMorgan") acquired certain assets from WaMu via a Purchase and Assumption Agreement (the "Purchase Agreement"), including the note and deed of trust evidencing and securing the Debtors' Loan.[3] (See Doc. #40, *Brief in*

_____

[2]  The Debtors *Complaint* states that WaMu "was taken over by the FDIC on September 28, 2008 and its assets sold through an insolvency proceeding." (*Complaint*, ¶ 13). Because this Court will take judicial notice of the documents relating the FDIC receivership of WaMu and the subsequent purchase of WaMu's assets by JPMorgan Chase Bank, N.A., this Court relates the accurate as opposed to alleged version of the events described. See *infra*. p. 4, note 3.

[3]  The Debtors have consented to this Court taking judicial notice of: (a) the *Office of Thrift Supervision Order* directing the Federal Deposit Insurance Corporation to act as Receiver of Washington Mutual Bank; and (b) the *Purchase and Assumption Agreement* between the FDIC and JPMorgan pursuant to Fed. R. Evid. 201. (See Audio Recording of Hearing Held in Courtroom D, July 29, 2011 (11:36 - 11:38 AM)). See also Javaheri v. JPMorgan Chase Bank, N.A., Civ. No. 10-08185 ODW (FFMx), 2011 WL 97684, *2 (C.D. Cal. Jan. 11, 2011) (finding judicial notice is appropriate as to both documents). As a result, the Court will enter a separate Order granting *Defendant JPMorgan Chase Bank N.A.'s Request for Judicial Notice in Support of Motion to Dismiss Plaintiff's Complaint* filed at Adv. No. 10-2654, Doc. #19.

*Opposition to Motion to Dismiss,* p. 3 <u>and</u> Audio Recording of Hearing Held in Courtroom D, July 29, 2011 (12:21 - 12:23 PM)).

At some point the Debtors defaulted on their mortgage obligation to JPMorgan. (Doc. #40, p. 3).   As a result, JPMorgan obtained a default judgment in mortgage foreclosure against the Debtors on August 6, 2010 in the Court of Common Pleas of Westmoreland County.[4]  (<u>See id.</u>; <u>see also</u> Doc. #18, Exhibit "A").  Shortly thereafter, the Debtors sent a rescission request to JPMorgan on or about August 8, 2010. (Doc. #40, p. 4).   The Debtors allege that this rescission request also constituted a "qualified written request" ("QWR") under 12 U.S.C. § 2605(e).  (*Complaint,* ¶ 64).   In a letter dated August 18, 2010, JPMorgan refused to accept the Debtors rescission request and returned several documents to the Debtors in response to the alleged QWR. (*Complaint,* ¶ 61, Exhibit "AI").

The Debtors filed a voluntary petition for chapter 13 bankruptcy relief on September 29, 2010.  (Case No. 10-26939, Doc. #1).  The Debtors' claim the value of the Property is $225,000 and as a result of their "rescission request" list JPMorgan as the holder of a "contingent" and "disputed" unsecured claim in the amount of $347,496.  (<u>Id.</u> at Schedules "A" and "F").  JPMorgan filed a proof of claim in the amount of $404,123.53. (<u>See</u> Case. No. 10-26939, Claim #19).   On December 24, 2010, the Debtors filed the instant *Complaint* against JPMorgan, Archer, and "other unknown Entities or persons." (Case No .10-26939, Doc. #39, Adv. No. 10-2654, Doc. #1).

---

[4]  The Debtor's *Complaint* makes no mention of the Debtors' default or the judgment in mortgage foreclosure.  However, the Debtors admit that both of these events occurred in their *Brief in Opposition to Motion to Dismiss.*  (<u>See</u> Doc. # 40, p. 3).  The Debtors have also consented to this Court taking judicial notice of the documents evidencing the entry of a judgment in mortgage foreclosure attached as Exhibit "A" to *Defendant JPMorgan Chase Bank, N.A.'s Brief in Support of Motion to Dismiss Plaintiff's Complaint.*  (<u>See</u> Audio Recording of Hearing Held in Courtroom Do, July 29, 2012 (11:37 - 11:38 AM)).

The *Complaint* is comprised of a dizzying array of factual allegations and legal conclusions in support of various claims against entities linked to the Refinancing. At its core, the *Complaint* alleges eight counts against JPMorgan and the other defendants.

- Count I is asserted against JPMorgan and "Other Unknown Entities or Parties" for various alleged violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). (*Complaint*, ¶¶ 45-62).

- Count II is asserted against JPMorgan only for various alleged violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA"). (Id. ¶¶ 63-73).

- Count III is asserted against JPMorgan for various alleged violations of the Fair Debt Collection Practices Act ("FDCPA"). (Id. ¶¶ 74-82).

- Count IV is asserted against JPMorgan for an alleged "544(A)(3) PREFERENCE" and seeks to exercise the avoidance powers of the Trustee to somehow avoid JPMorgan's allegedly unperfected security interest in the Property. (Id. ¶¶ 83-87).

- Count V is asserted against JPMorgan and alleges that through various acts JPMorgan "violated the catch-all provision of Pennsylvania's Unfair Trade Practices and Consumer Protection Law . . . ." (the "UTPCPL"). (Id. ¶ 91).

- Count VI is the final count alleged solely against JPMorgan and is for an alleged "breach of the implied covenant of fair dealing." (Id. ¶¶ 93-98).

- Count VII is asserted against JPMorgan and Archer for "civil conspiracy/fraud."[5] (Id. ¶¶ 99-102).

---

[5] While paragraph 102 of the *Complaint* states that "Plaintiffs demand judgment against the Plaintiffs . . ." this Court will assume that the Debtors are seeking judgment against the

(continued...)

- Finally, Count VIII (incorrectly identified as a second "Count VII"), is asserted against Archer and alleges that through various acts, Archer "violated the catch-all provision of Pennsylvania's Unfair Trade Practices and Consumer Protection Law . . . ." (Id. ¶ 105).

In response to the *Complaint*, JPMorgan moves to dismiss all counts with the exception of Count III[6] and Count VIII, which is asserted against Archer only. (See Doc. #17). The remaining claims against JPMorgan can be split into four categories: (1) non-bankruptcy claims asserted under Counts I, II, V, VI and VII seeking damages for the acts and/or omissions of WaMu (and affiliated entities) occurring prior to the execution of the Purchase Agreement; (2) a claim for rescission or "annulment" of JPMorgan's security interest in the Property pursuant to TILA provisions alleged in Count I; (3) non-bankruptcy claims for the alleged malfeasance of JPMorgan in its capacity as a servicer of the Loan; and (4) a bankruptcy avoidance and/or preference claim against JPMorgan seeking avoid JPMorgan's allegedly unperfected security interest in the Property.

JPMorgan alleges that the first three categories of counts in the *Complaint* should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) and/or 12(b)(6), applicable in this adversary proceeding through Federal Rule of Bankruptcy Procedure 7012. Specifically, JPMorgan argues that this Court is barred from exercising subject-matter jurisdiction over the first category of claims asserted under Counts I, II, V, VI and VII, because the Debtors have failed to comply with the administrative claims resolution

---

[5](...continued)
named defendants in Count VII.

[6] JPMorgan has not addressed Count III in its *Motion to Dismiss*. This fact is acknowledged in footnote number 3 of *Defendant JPMorgan Chase Bank, N.A.'s Brief in Support of Motion to Dismiss Plaintiffs' Complaint*. (See Doc. #18, p. 2 n.3). Thus, Count III shall go forward and this Court will order JPMorgan to file an Answer to Count III of the *Complaint*.

process required by the Financial Institutions Reform Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA").[7]  JPMorgan also alleges that this Court lacks subject-matter jurisdiction over the Debtors' attempt to rescind the Loan (the second category of claims) as a result of the *Rooker-Feldman* doctrine.[8]

As to the remaining claims under Counts I, II, V, VI and VII, JPMorgan argues that this third category of claims should also be dismissed for failure to state a claim as to each of these Counts pursuant to Fed. R. Civ. P. 12(b)(6) because the Debtors have not sufficiently alleged any wrongdoing by JPMorgan.

Finally, with respect to Count IV, both JPMorgan and the Trustee assert that the Debtors lack standing to pursue an avoidance action alleged under Chapter 5 of the Bankruptcy Code.  In support, both parties assert that in a chapter 13 case the plain language of the Bankruptcy Code prohibits any party other than the Trustee from exercising the various "strong arm" powers outline in Chapter 5.  The Trustee also argues that the Debtors have failed to articulate a cause of action for avoidance under either §§ 544, 547 or 548 of the Bankruptcy Code.

---

[7]  JPMorgan argues in the alternative that all of the Debtors' claims under Counts I, II, V, VI and VII, should be dismissed because the Debtors have not sufficiently alleged any wrongdoing by JPMorgan.  (See Doc. #18, pp. 10-12, 14, 17-21).  JPMorgan also alleges that the Debtors' claims for damages linked to the Refinancing under TILA (Count I) and RESPA (Count II) are barred by each applicable statute of limitations (see id. at pp. 12-13, 15), and the Debtors' claims asserted under the "catch-all" provision of the UTPCPL (Count V) alleging fraud or deceit are defective as they fail to allege fraud with particularity as required by Fed. R. Civ. P. 9(b).  (See id. at pp. 18-19).  It is not necessary for this Court to reach the merits of these arguments because, as set forth above, this Court finds that FIRREA bars this Court from exercising subject-matter jurisdiction over all of the Debtors' claims for damages alleged in Counts I, II, V, VI and VII.

[8]  JPMorgan argues in the alternative that the Debtors' rescission claim is barred by *res judicata*. (Doc. #18, pp. 5-7).

## II.  Jurisdiction

To the extent this Court has jurisdiction over this adversary proceeding, it has such jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O).

## III.  Standards and Order of Evaluation

### A.  Motion to Dismiss Under 12(b)(1)

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) "may present either a facial or a factual challenge to the court's jurisdiction." PennEnvironment v. RRI Energy Northeast Management Co., 744 F. Supp. 2d 466, 469 (W.D. Pa. 2010) (citing Petruska v. Gannon University, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). When a movant presents a facial attack based on the allegations in the complaint, courts must accept those allegations as true and construe them in the light most favorable to the plaintiff.  Id.  Where, however, the movant presents a factual challenge based on the failure of the plaintiff's claims to comport with a jurisdictional requirement, the plaintiff bears the burden of proof as to all facts underlying the jurisdictional allegations subject to the dispute.  Id. (citations omitted).

In this matter JPMorgan presents a factual attack by alleging that FIRREA bars this Court from adjudicating the majority of the claims asserted by the Debtors.  See Fiorello v. WAMU, Civ. Action No. 10-0273(FLW), 2010 WL 5392923, *4 (D.N.J. Dec. 22, 2010) (unpublished opinion).  Similarly, JPMorgan's assertion that the Rooker-Feldman doctrine bars this Court from asserting subject-matter jurisdiction because of a default judgment in mortgage foreclosure is also a factual attack.  See Brock v. Thomas, 782 F. Supp. 2d 133, 139 (E.D. Pa. 2011) (citations omitted).  As a result of these factual attacks to subject-matter jurisdiction, this Court is permitted to consider and weigh evidence

outside of the pleadings in deciding JPMorgan's *Motion to Dismiss*.  See Fiorello, 2010 WL 5392923, at *4.

<u>B.  Motion to Dismiss Under 12(b)(6)</u>

The Supreme Court has recently clarified the pleading standard for evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6). <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); <u>see also</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009)(discussing the pleading standard).  Under this test, a complaint will only survive dismissal under Fed. R. Civ. P. 12(b)(6) if the complaint contains "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  Pleadings that solely offer " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555).

The United States Court of Appeals for the Third Circuit has instructed district courts to incorporate two "working principles" when presented with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009).  First, while courts must accept all allegations of fact contained in the complaint as true, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." <u>Iqbal</u>, 556 U.S.  at 678 (quoting <u>Twombly</u>, 550 U.S. at 555).  Second, courts must engage in the "context-specific task" of determining whether a complaint "states a plausible claim for relief. . . ." <u>Id.</u> at 679 (citing <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007)).  When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts may consider the complaint, exhibits attached to the complaint and matters of

public record including judicial proceedings.  Sands v. McCormick, 502 F.3d 263, 268 (3d

Cir. 2007).

C. Order of Evaluation

At the July 29, 2011 hearing on the *Motion to Dismiss*, the arguments of the parties

closely echoed their briefs and primarily concerned whether this Court had subject-matter

jurisdiction over the majority of the claims alleged in the *Complaint*.  This also marked the

start of the evolution of the Debtors' arguments concerning Count IV and the order in

which this Court should consider the counts alleged in the *Complaint*.  In essence, the

Debtors' contend that the Court should consider the merits of the Debtors' *Complaint*,

specifically Count IV of the *Complaint*, first before any consideration should be had of the

subject-matter jurisdiction of this Court.  The Court, however, declines the Debtors'

invitation and instead determines that it must consider its subject-matter jurisdiction as

a threshold determination before it can consider the merit of the allegations contained

within the *Complaint*.

Count IV of the *Complaint* is asserted against JPMorgan as a "544(a)(3)

PREFERENCE."  No such preference cause of action exists in this section of the

Bankruptcy Code.  Thus, it is unclear what type action the Debtors are actually alleging.

The Debtors insisted at the July 29, 2011 hearing that their "544(a)(3)" cause of action

was one in the same with their TILA claim for rescission of the Loan.  (See Audio

Recording of Hearing Held in Courtroom D, July 29, 2011 (12:21 - 12:23 PM)).  By the

time of the September 7, 2011 hearing on the *Motion for Derivative Standing*, the Debtors'

position as to Count IV had substantially evolved.  At this hearing the Debtors appeared

to argue that instead of, or in addition to, a § 544 action, Count IV is a cause of action for

a "preference" (presumably asserted under 11 U.S.C. § 547).[9]  (See Audio Recording of

Hearing Held in Courtroom D, September 7, 2011 (11:05 - 11:07 AM) (11:24 - 11:30 AM)).

The Debtor's newly alleged preference theory appeared to be that the "foreclosure of the

Debtors' equity of redemption," allegedly occurring as a result of the State court judgment

in mortgage foreclosure, constituted a "transfer" that could be avoided if the Debtors were

permitted to utilize the Chapter 5 powers of the Trustee.  (See id. 11:04 - 11:07 AM)).  This

argument was a position that the Debtors had expressly rejected at the July 29th hearing

and had alleged to be the product of "an incorrect legal analysis."  (See Audio Recording

of Hearing Held in Courtroom D, July 29, 2011 (12:23 - 12:25 PM)).

Further confusing the Debtors' position as to Count IV, was the Debtors' newfound

insistence that the only way they could get "back to" the merits of the other counts in the

Complaint, would be if they were successful in avoiding the foreclosure judgment under

Count IV.  (See Audio Recording of Hearing Held in Courtroom D, September 7, 2011

(11:05 - 11:07)).  Implicitly here, the Debtors' concede that absent a successful preference

claim under 11 U.S.C. § 547, the Debtors' other claims are without merit.  Once again,

this contradicted the Debtors' argument proffered at the July 29 hearing that Count IV

was "essentially inseparable" from their argument that the Loan was effectively rescinded

under TILA.  (See Audio Recording of Hearing Held in Courtroom D, July 29, 2011 (12:23

- 12:25 PM)).  While the Debtors' position as to what they were alleging in Count IV

continued to evolve, the Trustee and JPMorgan were steadfast in their opposition to the

---

[9]  This revised characterization is further complicated by the Debtors' initial insistence
at the September 7 hearing that the "TILA claims stand on their own." (See Audio Recording of
Hearing Held in Courtroom D, September 7, 2011 (11:06 - 11:07 AM)).

Debtors' attempt to exercise the avoidance powers of the Trustee.  (See Doc. #49; see also Audio Recording of Hearing Held in Courtroom D, September 7, 2011 (11:08 - 11:10 AM)).

As the Debtors were unclear regarding the level of interdependency between Count IV and the other counts alleged in the *Complaint*, the Court provided the parties with the opportunity to brief, *inter alia*, the issue as to what order this Court should consider the allegations in the *Complaint*. (See Audio Recording of Hearing Held in Courtroom D, September 7, 2011 (11:33 - 11:35 AM)).  In the supplemental briefing filed by the Trustee and JPMorgan on the issue of derivative standing, neither party addressed this issue. (See Doc. ##57, 58, 60).  The Debtors also did not address this issue in their reply to the supplemental briefing filed in the main case on February 19, 2012. (See Case No. 10-26939, *Debtors' Brief in Reply to the Trustee's Supplemental Brief Opposing Derivative Standing*, Doc. 84).  Thus the Court will follow a well established order for evaluating a motion to dismiss.  That is, this Court must generally first consider whether it maintains subject-matter jurisdiction over the claims asserted by the Debtors prior to reaching the merits of the *Complaint*.  Goldstein v. Eby-Brown, Inc. (In re Universal Mktg.), 459 B.R. 573, 575 (Bankr. E.D. Pa. 2011) (citations omitted).  If this Court lacks subject-matter jurisdiction it would not be appropriate to dismiss the claims asserted pursuant to Fed. R. Civ. P. 12(b)(6); rather dismissal without prejudice pursuant to Fed. R. Civ. P. 12(b)(1) would be appropriate.  See id.

## V.  FIRREA Jurisdictional Bar

JPMorgan alleges that the mandatory administrative claims process outlined in FIRREA bars this Court from exercising subject-matter jurisdiction over the first category of claims asserted in Counts I, II, V, VI and VII.  FIRREA is a statute that creates a procedure for administering claims filed against failed depository institutions.  See Praxis

Properties, Inc. v. Colonial Sav. Bank, S.L.A., 947 F.2d 49, 62-63 (3d Cir. 1991) (citations

omitted).   The purpose of FIRREA is to facilitate Congress' goal to "efficiently and

expeditiously resolve claims against a failed institution without recourse to litigation."

Centennial Assocs. v. FDIC, 927 F. Supp. 806, 810 (D.N.J. 1996) (citing H.R.Rep. No.

101-54(I), 101st Cong., 1st Sess. 418-419, reprinted in 1989 U.S. Code Cong. & Admin.

News 86, 214-215).

     Pursuant to FIRREA, when the FDIC is appointed as receiver of a closed depository

institution, it succeeds to "all rights, titles, powers and privileges of the insured depository

institution . . . ." 12 U.S.C. § 1821(d)(2)(A)(I).   The FDIC may subsequently "transfer any

asset or liability of the institution . . . ." 12 U.S.C. § 1821(d)(2)(G)(i)(II).

     To create an efficient process for the handling of claims against a failed lending

institution, FIRREA requires the FDIC to provide notice of the institution's failure to the

creditors of the institution and such notice directs those creditors to present their claims

by a bar date specified on the notice.   12 U.S.C. § 1821(d)(3)(B).   Claims that are not filed

with the FDIC by the bar date are generally disallowed.   12 U.S.C. § 1821(d)(5)(C)(i).   As

to timely filed claims, the FDIC has 180 days from the date a claim is filed to either allow

or disallow it.   12 U.S.C. § 1821(d)(5)(A). If the claim is not ruled upon within this time

frame, or is denied, the claimant has 60 days to seek an administrative review or file an

action in the district court.   12 U.S.C. § 1821(d)(6)(A). If the claimant fails to exercise

either option, the "claimant shall have no further rights or remedies with respect to such

claim."  12 U.S.C. § 1821(d)(6)(B).

     As the result of the availability of this administrative process, FIRREA bars any

court from exercising jurisdiction over:

     (i) any claim or action for payment from, or any action seeking a
     determination of rights with respect to, the assets of any depository

institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D).[10]   Section 1821(d)(6), provides that courts <u>only</u> have jurisdiction "over claims that have first been presented to the FDIC under its administrative review process." <u>Tri-State Hotels, Inc. v. Fed. Deposit Ins. Corp.</u>, 79 F.3d 707, 712 (8th Cir. 1996).  Taking these statutory provisions together, the United States Court of Appeals for the Third Circuit has characterized the jurisdictional bar in 12 U.S.C. § 1821(d)(13)(D) as "a statutory exhaustion requirement . . . ." <u>National Union Fire Ins. Co. v. City Sav., F.S.B.</u>, 28 F.3d 376, 383 (3d Cir. 1994).  In other words, "in order to obtain jurisdiction to bring a claim in federal court, one must exhaust administrative remedies by submitting the claim to the receiver in accordance with the administrative scheme for adjudicating claims detailed in § 1821(d)." <u>Id.</u> (citing <u>Rosa v. RTC</u>, 938 F.2d 383, 391 (3d Cir.1991), <u>cert.</u> <u>denied</u>, 502 U.S. 981, 112 S. Ct. 582, 116 L. Ed. 2d 608 (1991)).

A.

By and large, Counts I, II, V, VI and VII of the *Complaint*, are based solely on the conduct of WaMu and its alleged affiliates during the Refinancing.  As the bulk of allegations in each of the respective counts relate to "any act of omission of [WaMu] or the Corporation as a receiver. . ." they are subject to the jurisdictional bar imposed by FIRREA.  <u>See</u> 12 U.S.C. § 1821(d)(13)(D).  Because FIRREA prohibits <u>all</u> courts from

---

[10] In FIRREA's statutory provisions, "Corporation" is used to refer to the Federal Deposit Insurance Corporation, or "FDIC." <u>See</u> 12 U.S.C. § 1811(a).

hearing any such claims, JPMorgan's *Motion to Dismiss* pursuant to Fed. R. Civ. P. 12(b)(1) will be granted as to the first category of claims alleged.

Count I avers that WaMu violated various provisions of TILA by calculating a yield spread premium as part of the "amount financed" rather than as a finance charge, and by failing to disclose the cost of private mortgage insurance as part of the HUD-1. (*Complaint*, ¶¶ 48-52). The Debtors also aver through Count I that "WAMU or other unknown parties or entities" violated RESPA by allegedly providing a "kickback" to Ace in the form of the yield-spread premium in question. (Id. ¶ 58). Finally, the Debtors allege that through the Refinancing, WaMu and Ace engaged in a "churning" of the Debtors' account "to secure unnecessary and spurious brokerage fees and interest charges." (Id. ¶ 54).

Even if the allegations in Count I were sufficiently plead, they only relate to the alleged "act[s] or omission[s]" of WaMu and other parties to the Refinancing. It is undisputed that the Refinancing was concluded prior to the time that JPMorgan acquired the assets of WaMu from the FDIC. (See, e.g., *Complaint*, ¶¶ 13, 21; Doc. #40, p. 3). Therefore, the claims for damages asserted in Count I may only be resolved through the administrative claims procedure required by FIRREA.

Count II alleges that, among other things, the yield spread premium was used as a "kickback" to fund the loan and pay closing costs. (See *Complaint*, ¶ 67). Count II also alleges that the Debtor's were required to purchase title insurance from WaMu's alleged title insurer in violation of RESPA. (Id. ¶¶ 67-73). Once again, these allegations concern only the acts of WaMu and its alleged affiliates in connection with the Refinancing. Thus this Court lacks subject-matter jurisdiction to hear these claims pursuant to FIRREA. See 12 U.S.C. § 1821(d)(13)(D).

In Count V the Debtors allege that the UTPCPL was violated because of inaccurate disclosures in the HUD-1, RESPA was not complied with, a "kickback" was paid, and JPMorgan "as the successor to WAMU" was "lying to the [Debtors] for its own material benefit . . ." in relation to the Refinancing. (*Complaint*, ¶ 91). Count VI alleges that in addition to all of the acts alleged in Count V, JPMorgan breached its "duty of good faith and fair dealing" because it was "willfully blind" to the alleged fact that the HUD-1 was not signed, and, thus, loaned money without regard to the Debtors' ability to repay. (Id. ¶¶ 96-97). Finally, to the best of this Court's understanding, Count VII appears to assert that "WAMU and its successor" along with their respective "employees and agents" engaged in "civil conspiracy/fraud" by allegedly using either a false and/or unsigned HUD-1 to consummate the Refinancing. (Id. ¶ 100).

As with the great majority of the claims alleged in Counts I and II, the claims in Counts V, VI and VII concern acts that occurred during the Refinancing. As a result, the alleged "act[s] and omission[s]" complained of could have only occurred at the behest of WaMu and/or its alleged affiliates and not JPMorgan. Thus, these claims fall squarely into the jurisdictional bar imposed by FIRREA in § 1821(d)(13)(D), and must be asserted through FIRREA's administrative claims process.

Throughout the *Complaint*, the Debtors refer to JPMorgan as the "successor" to WaMu (Id. ¶¶ 96, 100), "successor in interest" to WaMu (Id. ¶ 67), WaMu's "alter-ego" (Id. ¶¶ 92), and use WaMu and JPMorgan interchangeably because JPMorgan acquired the WaMu assets. (Id. ¶¶ 60, 97). These characterizations are not enough to foist liability upon JPMorgan outside of the claims process set forth in FIRREA. The fact remains that the jurisdictional bar outlined by FIRREA applies not only to the receiver of a failed institution's assets, but also to third-party purchasers of the assets of the failed

institution.  See Aber-Shukofsky v. JPMorgan Chase & Co., 755 F. Supp. 2d 441, 447 (E.D.N.Y. 2010) ("[P]laintiffs cannot evade FIRREA's mandatory exhaustion requirement simply by asserting claims against defendants, as third-party purchasers of the failed bank's assets, for acts or omissions that relate to [the failed bank].").  Allowing the Debtors to avoid the jurisdictional bar imposed by FIRREA simply by asserted their claims against JPMorgan as the assuming bank "would encourage the very litigation that FIRREA aimed to avoid."  Shirk v. JPMorgan Chase Bank, N.A. (In re Shirk), 437 B.R. 592, 601 (Bankr. S.D. Ohio 2010) (citing Village of Oakwood v. State Bank & Trust Co., 539 F.3d 373, 386 (6th Cir. 2008)).

B.

Though the Debtors admit that "the Administrative Courts of the FDIC have broad powers to determine the liabilities of the failed bank, WAMU," they proffer two arguments in support of their position that this Court maintains subject-matter jurisdiction over the first category of claims in Counts I, II, V, VI and VII.  (Doc. #40, p. 7).  First, the Debtors allege that this Court may adjudicate the first category of claims because JPMorgan "waived" its FIRREA jurisdictional protections by filing a proof of claim in the Debtors' bankruptcy case.  (See id. at pp. 8-10).  Second, the Debtors argue that because JPMorgan "never asserted that FIRREA applied to the [Debtors'] mortgage" prior to filing its *Motion to Dismiss*, JPMorgan is collaterally and/or equitably estopped from asserting FIRREA jurisdictional provisions.[11]  (See id. at p. 11).  In the alternative, the Debtors argue that even if this Court were to conclude that it did not have subject-matter jurisdiction over the counts in question, it should "transfer the matter to the Administrative Court of the

---

[11]  It is not entirely clear what theory of estoppel the Debtors are asserting.  While the *Complaint* recites the elements of equitable estoppel, the Debtors' conclude their estoppel discussion by referring to the preclusive doctrine of "collateral estoppel."  (See Doc. #40, p. 11).

Federal Deposit Insurance Corporation" pursuant to 28 U.S.C. § 1406(a), rather than dismissing the *Complaint*.    (Id. at p. 12).

1.

As an initial matter, this Court must deny the alternate relief sought by the Debtors.  Generally, courts that do not maintain subject-matter jurisdiction over an action do not have the authority to transfer that action pursuant to 28 U.S.C. § 1406. Atlantic Ship Rigging Co. v. McLellan, 288 F.2d 589, 591 (3d Cir. 1961) (*per curiam*). Indeed, § 1406 only concerns the ability of district courts to cure "venue" defects not a defect involving lack of subject-matter jurisdiction.  See 28 U.S.C. § 1406(a).

This Court does recognize, however, that courts lacking jurisdiction maintain the ability to transfer an "action or appeal to any other such court in which the action or appeal could have been brought. . ." if such a transfer is in the interest of justice.  28 U.S.C. § 1631.  Nevertheless, even if the Debtors sought relief under this seemingly more appropriate statutory provision, a transfer would not be available under these circumstances.  Section 1631 of title 28 only enables a transfer to "courts," and administrative bodies such as the FDIC are not "courts" under the applicable statutory definition.  Schafer v. DOI, 88 F.3d 981, 987 (Fed. Cir. 1996) (citing 28 U.S.C. § 610 (1994)).  Thus, this Court finds that a transfer of the first category of claims alleged in the *Complaint* would be inappropriate, and the Debtors have not asserted any authority to the contrary.

2.

The Debtors' second argument, averring that JPMorgan is "estopped" from asserting a lack of subject-matter jurisdiction, is equally without merit.  The Debtors assert that by not raising FIRREA while rejecting the Debtors' request to rescind the Loan,

JPMorgan is somehow estopped from relying on the FIRREA jurisdictional bar. (Doc. #40, p. 11). The Debtors do not cite, and the Court cannot find, any authority to support this theory. To the contrary, it is well-settled that subject-matter jurisdiction may be challenged at any time.[12] Int'l Fin. Corp. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.), 399 F.3d 558, 565 (3d Cir. 2005) (citations omitted). Therefore, this Court rejects the Debtors' assertion that JPMorgan is estopped from asserting the FIRREA exhaustion of remedies requirement as a bar to this Court's subject-matter jurisdiction over the first category of claims alleged in the *Complaint*.

3.

Finally, the Debtors' waiver argument, based upon JPMorgan's filing of a proof of claim, must also be rejected. Specifically, the Debtors assert that by filing a proof of claim in the Debtors' bankruptcy case, JPMorgan waived "its FIRREA protections" thereby allowing this bankruptcy court to exercise subject-matter jurisdiction over the Debtors' "counterclaims" to the proof of claim filed by JPMorgan. (See Doc. #40, pp. 8-10). In support of this proposition the Debtors cite three case from the Supreme Court: Langenkamp v. Culp, 498 U.S. 42 (1990), Katchen v. Landy, 382 U.S. 323 (1966), and Stern v. Marshall, — U.S. ——, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).

As an initial matter, the Debtors' position that the cases cited concern the waiver of a bar to the exercise of subject-matter jurisdiction is misguided. Each of the cases cited concerns limitations contained in Article III of the United States Constitution regarding the ability of bankruptcy courts to finally adjudicate certain cases and controversies. See Katchen v. Landy, 382 U.S. 323 (1966) (holding that a bankruptcy

---

[12] Moreover, equitable estoppel cannot be used to confer subject-matter jurisdiction on a federal court. See Doe v. FDIC, No. 11 Civ. 307(BSJ)(RLE), 2012 WL 612461, *4, n.8 (S.D.N.Y. Feb. 27, 2012).

referee maintained summary jurisdiction to order the surrender of a voidable preference)
and Langenkamp v. Culp, 498 U.S. 42 (1990) (holding a creditor that filed a claim against
the estate was not entitled to a jury trial on a preference claim asserted by a bankruptcy
trustee).  The ability of the bankruptcy courts to adjudicate a case or controversy in the
face of a statutory bar to the exercise of subject-matter jurisdiction was not at issue in
either case.

This Court has previously held that parties may consent (or waive their ability to
object) to the final adjudication of certain cases or controversies by the bankruptcy court.
See Ardi Limited P'ship v. The Buncher Co. (In re River Entertainment Co.), Bankr. No.
07-024515, Adv. No. 10-2495, 2012 WL 1098570, *12 (Bankr. W.D. Pa. March 30, 2012).
Attempting to extend subject-matter jurisdiction through consent is entirely different.
The Supreme Court has consistently held that parties cannot consent to create subject-
matter jurisdiction where it does not otherwise exist.  See, e.g., Am. Fire & Cas. Co. v.
Finn, 341 U.S. 6, 17-18 (1951) (holding that an extension of federal jurisdiction through
consent of the parties is not permitted) (citations omitted), People's Bank v. Calhoun, 102
U.S. 256, 260-61 (1880) ("[T]he mere consent of parties cannot confer upon a court of the
United States the jurisdiction to hear and decide a case.").

Moreover, the Supreme Court's holding in Stern directly contradicts the premise
for which the Debtors appear to cite the case.  Stern held that bankruptcy courts lack the
constitutional authority to enter a final judgment on a state-law tort counterclaim, when
the adjudication of that counterclaim would not "necessarily be resolved in the claims
allowances process."  Stern, 131 S. Ct. at 2618.  As part of this holding, the Supreme
Court concluded that by merely filing a defamation claim against a debtor in bankruptcy,
a creditor had not consented to the adjudication of state-law counterclaims brought by

00007488.WPD                                -20-

that debtor for tortious interference. Id. at 2617. Thus, the Stern opinion actually seeks

to correct the over-broad reading of its prior decisions in Katchen and Langenkamp that

the Debtors seek to employ in the instant matter.

Just because JPMorgan has filed a proof of claim in the Debtors' bankruptcy does

not mean it has consented to resolution of all matters between itself and the Debtors in

this Court. Nor does it mean that JPMorgan has, or could have, waived the jurisdictional

bar imposed by the FIRREA exhaustion requirement. As noted in Stern, to infer consent

from the mere filing of a claim would be inappropriate, as those parties holding claims

against a debtor in bankruptcy do not have a forum outside of the bankruptcy court

where they may seek to recover from the debtor's estate. Id. at 2614. Concluding

otherwise would leave JPMorgan with the Hobson's choice of either: (1) forgoing the

FIRREA's statutory procedure for resolving disputes, or (2) abandoning its claim against

the Debtors entirely. This Court simply does not believe that Congress intended such a

result at the intersection of the Bankruptcy Code and FIRREA. See Sunshine Dev. v.

FDIC, 33 F.3d 106, 116 (1st Cir. 1994).

In sum, the claims for damages in Counts I, II, V, VI and VII, concern only the

"act[s] or omission[s]" of WaMu and other entities allegedly involved in the Refinancing

prior to the execution of the Purchase Agreement. As a result, 12 U.S.C. § 1821(d)(13)(D)

bars any court from exercising jurisdiction over these claims until the Debtors have

exhausted the FIRREA administrative process. The Debtors' contentions that JPMorgan

has somehow created subject-matter jurisdiction in the bankruptcy court through wavier

or estoppel are without merit. Additionally, the Debtors have failed to establish a right

to have the claims transferred to an administrative body. As the Debtors do not allege

that they have exhausted their administrative remedies as required by FIRREA, this Court

does not have subject-matter jurisdiction over the first category of claims asserted.

Being that this Court does not maintain subject-matter jurisdiction over the first

category of claims alleged in the *Complaint*, there is no need to address the other grounds

for dismissal put forward in the *Motion to Dismiss*. Therefore, this Court will enter an

order dismissing the claims for damages alleged in Count I, II, V, VI and VII, without

prejudice to the Debtors' ability to re-file the claims in a proper forum.

<u>C.</u>

Though the majority of the Debtors' claims in Counts I, II, V, VI and VII are subject

the FIRREA jurisdictional bar, FIRREA does not preclude this Court from exercising

subject-matter jurisdiction over claims that are "true" defenses to the proof of claim

asserted by JPMorgan in the Debtors' case.[13]  <u>See</u> <u>National Union</u>, 28 F.3d at 393 ("We

---

[13]  The ability of debtors to assert defenses to claims of the FDIC (and acquiring entities) is an essential component of why there is no "debtor in bankruptcy" exception to the FIRREA exhaustion requirement.  Though several Circuit courts have concluded that FIRREA applies to debtors as well as creditors, these courts have stopped just short of holding that FIRREA applies to debtors in bankruptcy.  <u>See</u> e.g., <u>Tri–State Hotels</u>, 79 F.3d at 714 n.11; <u>Freeman v. FDIC</u>, 56 F.3d 1394, 1401-02 (D.C. Cir. 1995).  <u>See also</u> <u>McCarthy v. FDIC</u>, 348 F.3d 1075, 1079-1080 (9th Cir. 2003) (collecting cases).  Courts holding that debtors in bankruptcy may be exempt from the FIRREA exhaustion requirement often cite two reasons for their conclusion. First, courts surmise that FIRREA applies only to "creditors" of failed lending institutions, and not "debtors" based on the fact the neither the statutory language nor the legislative history of FIRREA contains any reference to "debtors."  <u>See</u> <u>In re Continental Financial Resources, Inc.</u>, 154 B.R. 385, 388 (D. Mass 1993) (collecting cases).  Second, courts surmise that by ousting the bankruptcy courts of jurisdiction over actions between debtors and the FDIC, "the unity of the bankruptcy process might be fractured."  <u>Freeman</u>, 56 F.3d at 1401 (citing <u>In re Parker North American Corp.</u>, 24 F.3d 1145, 1152–53 (9th Cir.1994)).  This Court rejects the first reason based on binding precedent from the United States Court of Appeals for the Third Circuit holding that the FIRREA provisions apply not only to "creditors" of failed lending institutions, but also to their "debtors."  <u>National Union</u>, 28 F.3d at 392 (3d Cir. 1994).  This Court also finds that the concerns over a "fractionalization" of the bankruptcy process are amply mitigated by allowing debtors to assert "true" defenses to claims filed by the FDIC as part of the claims adjudication process.  This protects the due process rights of the debtor and causes no disruption in the claims adjudication process.  Similarly, preventing debtors from using the bankruptcy forum to assert claims for damages against the FDIC to augment their bankruptcy estate protects the integrity of the FIRREA administrative claims process.  Thus,

(continued...)

believe that the plain meaning of the language contained in § 1821(d)(13)(D) indicates that the statute does not create a jurisdictional bar to defenses or affirmative defenses which a party seeks to raise in defending against a claim.").

The United States Court of Appeals for the Third Circuit was careful to stress that the defenses asserted must be "true" defenses and not just counterclaims camouflaged as defenses for the purpose of skirting the FIRREA jurisdictional bar.  Id. at 394.  In distinguishing between a "claim" and a "defense" the Third Circuit Court of Appeals states that a "defense" is a "response to the claims of the other party setting forth reasons why the claims should not be granted" and an "affirmative defense" "attacks the plaintiff's [legal] right to bring an action . . . ."  Id. at 393 (citing Black's Law Dictionary 419, 60 (6th ed. 1990)).  Alternatively, the Court defined a "claim" as "essentially an action which asserts a right to payment."  Id. at 394.

It is clear that the first category of claims asserted by the Debtors are not affirmative defenses but are "claims" subject the FIRREA jurisdictional bar.  See Rundgren v. Machington Mut. Bank, F.A., No. 09-00495, 2010 WL 4960513, *5 (D. Haw. Nov. 30, 2010) (citing cases).  Indeed, the bulk of the relief sought in Counts I, II, V, VI and VII, is for monetary damages, attorneys fees and costs, and "judgment" against JPMorgan. (Complaint, ¶¶ 62, 73, 92, 98, 102).  Further, these claims are based on the "act[s] or omission[s]" of WaMu prior to the initiation of the FDIC receivership and the subsequent acquisition of WaMu's assets by JPMorgan.  As a result, none of these

---

[13](...continued)
subject to the understanding that parties may assert defenses to the proof of claims filed by the FDIC or an acquiring entity, this Court finds that whether or not a party is in bankruptcy is not relevant to whether that party is required to exhaust its administrative remedies under FIRREA.  See Jacobs v. PT Holdings, Inc., No. 8:11CV106, 2012 WL 458418, *9 (D. Neb. Feb. 13, 2012).

requests for relief can be considered "defenses" and are, thus, barred by the FIRREA

provisions.

The Debtors' have inaccurately characterized all of the claims in the *Complaint* as

"counterclaim[s] against [JPMorgan's] proof of claim . . . ." (See Doc. #40, p. 10).  This

characterization is contrary to the Debtors' own interests as "counterclaims" are expressly

barred by FIREAA.  See National Union, 28 F.3d at 394.  Nevertheless, this Court has

taken it upon itself to separate what appear to be "true" defenses from the claims (or

"counterclaims") alleged in the *Complaint*.  As a result of this process the Court is able to

identify one item that could properly be characterized as a "defense" in the Debtors'

*Complaint*.  That item is the remedy of rescission[14] (or stated another way, the request for

an "annulment" of JPMorgan's security interest in the Property sought in Count I.[15]).

---

[14]  Some courts have concluded that "rescission" is an equitable remedy barred by the
section 1821(j) of FIRREA.  See, Shirk v. JPMorgan Chase Bank, N.A. (In re Shirk), 437 B.R.
592, 601 (Bankr. S.D. Ohio 2010) (citing cases).  To prevent interference with the FDIC's
management and disposition of the assets of failed institutions, Congress drafted an additional
measure preventing courts from entering orders that affect the FDIC's exercise of its statutory
powers:

> (j) Limitation on court action
> Except as provided in this section, no court may take any action, except at the
> request of the Board of Directors by regulation or order, to restrain or affect the
> exercise of powers or functions of the Corporation as a conservator or a receiver.

12 U.S.C. § 1821(j).  Several courts have found that requests for injunctions, rescission and
declaratory relief are among the various types of equitable relief barred under § 1821(j).  See
Radian Ins., Inc. v. Deutsche Bank Nat'l Trust Co., Civ. No. 08-2993, 2009 WL 3163557, *5
(E.D. Pa. Oct. 1, 2009) (collecting cases).  However, the United States Court of Appeals for the
Third Circuit has categorized "rescission" as an "affirmative defense" and this Court will follow
suit. National Union, 28 F.3d at 394 (3d Cir. 1994).

[15]  While averred as a separate form of relief, the Debtors' attempt to "annul" the
security interest maintained by JPMorgan in the Debtors' Property appears to be just a simple
consequence of rescission under TILA.  See 12 C.F.R. § 226.23(d)(1) ("When a consumer
rescinds a transaction, the security interest giving rise to the right of rescission becomes void
and the consumer shall not be liable for any amount, including any finance charge.").  Thus,
the "defenses" asserted shall be collectively referred to as "rescission" for the remainder of this
*Memorandum Opinion*.

The United States Court of Appeals for the Third Circuit has identified rescission as an "affirmative defense" and not a claim.  See id.  Additionally, without reaching the substantive issue of what affect the Purchase Agreement between the FDIC and JPMorgan might have on the validity of the Debtors claim, a TILA claim for rescission may be lodged against "any assignee of the obligation."  See 15 U.S.C. § 1641(c).  Therefore, as JPMorgan remains the assignee of the Debtors' mortgage, rescission under TILA is a defense that the Debtors may assert against JPMorgan's claim filed in the Debtors' bankruptcy case.  See Rundgren, 2010 WL 4960513, at *5 (citing King v. Long Beach Mortg. Co., 672 F. Supp. 2d 238, 246 (D. Mass. 2009)).  But, as set forth more fully below, this defense is without merit.

## V.  Rooker-Feldman Doctrine

As described above, FIRREA does not bar this Court from exercising jurisdiction over the Debtors' TILA claim for rescission.  However, review is barred by the *Rooker-Feldman* doctrine.

### A.

The *Rooker-Feldman* doctrine states that federal courts, other than the U.S. Supreme Court, are prohibited "from exercising appellate jurisdiction over final state-court judgments."   Lance v. Dennis, 546 U.S. 459, 463, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006).  The jurisdictional limitations imposed by *Rooker-Feldman* apply not only to state court judgments entered following a trial on the merits, but also to default judgments.  See, e.g., Knapper v. Bankers Trust Co., 407 F.3d 573 (3d Cir. 2005); Stuart v. Decision One Mortgage Co., LLC (In re Stuart), 367 B.R. 541 (Bankr. E.D. Pa. 2007); Holler v. Fairbanks Capital Corp. Serv. Ctr. (In re Holler), 342 B.R. 212 (Bankr. W.D. Pa. 2006).

According to the United States Court of Appeals for the Third Circuit, there are now four elements that must be satisfied for the *Rooker-Feldman* doctrine to apply: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005)).  Each of these elements apply with regard to the rescission defense asserted by the Debtors as to the second category of "claims" alleged in the *Complaint*.

The Debtors concede that both the first and third elements of the Great Western test are satisfied.  (See Doc. #40, p. 15).  The Court reaches this conclusion because the Debtors admit that they "lost" at the state court level as a result of the foreclosure judgment entered against them on August 6, 2010. (See id.).  The Debtors also admit that the judgment in mortgage foreclosure was entered before their bankruptcy case was commenced on September 29, 2010.  (See id.).

The Debtors, however, insist that they are not complaining of any injury caused by the state court judgment and are not inviting this court to review or reject the judgment.  (See id. pp. 15-16).  Instead, the Debtors insist that they are only complaining of the actions of WaMu in consummating the Refinancing and JPMorgan's alleged failure to respect the Debtors' rescission request.  (See id. at p. 15).  Additionally, the Debtors insist that they are only challenging the validity of JPMorgan's claim, not seeking a review or rejection of the state court judgment.  (See id.).  This Court is not persuaded.

It would be impossible for this Court to hold that JPMorgan does not have a claim secured by the Property or that the Debtors have a right to rescind the Loan, without reviewing or rejecting the state court foreclosure judgment.  This Court has previously concluded that actions in mortgage foreclosure in Pennsylvania depend upon the existence of a valid mortgage.  Calabria v. CIT Consumer Group (In re Calabria), 418 B.R. 862, 866 (Bankr. W.D. Pa. 2009) (citing Randall v. Bank One Nat'l Ass'n (In re Randall), 358 B.R. 145, 158 (Bankr. E.D. Pa. 2006)).  A finding that the Debtors' mortgage is invalid, would be tantamount to a finding that the state court foreclosure judgment was not valid and, thus, would result in this Court reviewing the judgment entered by the State court.

This Court recently arrived at the same conclusion in a similar case involving Debtor's counsel, In re Washington, Bankr. No. 08-24389, Adv. No. 11-2460, 2012 WL 767863 (Bankr. W.D. Pa. March 7, 2012).  In Washington, the Court held that the *Rooker-Feldman* doctrine prevented a debtor from challenging the standing of a mortgagee to file a proof of claim, when the state court had already entered a foreclosure judgment in favor of that mortgagee.  Id. at *7.  In so holding, the Court rejected this same argument that the second and fourth elements of the Great Western test were not satisfied because the debtor was only complaining of injuries resulting from the actions of the mortgagee and was only asking the bankruptcy court to consider whether the mortgagee had a valid claim.  Id.  As is the case here, the Court in Washington found that a ruling which held that the mortgagee did not have a valid claim "would clearly invalidate the state court judgment."  Id.

The Debtors also appear to allege that the TILA provision concerning the expiration of a debtor's right to rescind a transaction, somehow trumps the bar to this Court's review

of a state-court judgment imposed by the *Rooker-Feldman* doctrine. (Doc. #40, pp. 12-14).[16]  The Debtors, however, are unable to cite any authority for this proposition.  (See Audio Recording of Hearing Held in Courtroom D, July 29, 2012 (12:12 - 12:14 PM)).

Furthermore, the Debtors' argument has repeatedly been considered and rejected within the Third Circuit in other cases.  See, e.g., In re Cooley, 365 B.R. 464 (Bankr. E.D. Pa. 2007), and Stuart, 367 B.R. at 550 ("[T]he bankruptcy court lacks jurisdiction to consider a claim to enforce TILA rescission rights if a judgment in foreclosure has been entered prior to exercising rescission rights under TILA.") (citation omitted).

For example, in Cooley, the United States Bankruptcy Court for the Eastern District of Pennsylvania explained that the *Rooker-Feldman* analysis did not "hinge" on a debtor's alleged an "independent" right to rescission. Cooley, 365 B.R. at 470-473. Rather, the Cooley court held that review of the debtor's TILA rescission claims was barred by the *Rooker-Feldman* doctrine because "granting rescission would negate the foreclosure judgment." Id. at 470.  As explained by the court in Stuart, the rescission process "affects more than the existence and validity of the mortgage . . . ." Stuart, 367 B.R. at 552.  The TILA rescission process essentially requires a complete adjustment on the liability between the debtor and creditor because of the statutory liabilities of the parties based on their conduct.  See id.  To enforce a rescission requires that the court must determine that the debtor's liability on the mortgage would be different from the amount of the state court foreclosure judgment; thus any rescission determination necessarily reviews and alters that state court judgment. Id. at 552-53.

---

[16]  The provision in question states that assuming the material disclosure requirements of the TILA are not satisfied, the "right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first . . . ." 15 U.S.C. § 1635(f).

In addition to <u>Cooley</u> and <u>Stuart</u> there exists substantial precedent within the Third Circuit that the *Rooker-Feldman* doctrine prevents federal courts from granting rescission <u>after</u> the entry of a state-court judgment in mortgage foreclosure has been entered.  <u>See</u>, <u>e.g.</u>, <u>Madera v. Ameriquest Mortg. Co. (In re Madera)</u>, 586 F.3d 228 (3d Cir. 2009) (finding that a grant of rescission would negate a foreclosure judgment because it would amount to a finding that no valid mortgage existed), <u>Dougal v. Saxon Mortg. (In re Dougal)</u>, 395 B.R. 880, 891 (Bankr. W.D. Pa. 2008) ("[P]ursuant to the *Rooker-Feldman* doctrine the state foreclosure judgment [entered before the alleged notice of rescission was sent] effectively ties the Court's hands and prevents it from granting a rescission."), <u>Randall</u>, 358 B.R. at 159 ("[T]he *Rooker-Feldman* doctrine bars a federal court from exercising jurisdiction over a TILA rescission claim first asserted after the entry of a state court foreclosure judgment.").

In the instant matter the mortgage foreclosure was entered on August 6, 2010 and the Debtors admit that the alleged rescission request was drafted and submitted on or around August 8, 2010.[17]  (<u>See</u> Doc. #40, pp. 3-4).  Thus, despite their alleged "independent" right to rescind the Loan under TILA, the Debtors cannot seek review of the state court judgment in mortgage foreclosure in this Court.

---

[17] In their *Complaint* the Debtors alleged that they "wrote both Chase and WAMU and attempted to rescind the obligation." (*Complaint*, ¶ 60).  In support, the Debtors allege that "[a] true and correct copy of the rescission letter is attached and incorporated herein as Exhibit AH." (<u>Id.</u> ¶ 60).  However, upon examining Exhibit "AH", the Court finds an unsigned rescission request dated December 21, 2010.  (<u>See</u> *Complaint*, Exhibit "AH").  This letter is dated more than four months <u>after</u> the judgment in mortgage foreclosure was entered against the Debtors in State court.  The Court assumes the date on this letter must be in error as JPMorgan sent a response dated August 19, 2010, recognizing receipt of some correspondence from Counsel for the Debtors on August 16, 2010.  In any event there is no indication that the Debtors' alleged rescission request was drafted or submitted prior to the August 6, 2010 entry of a judgment in mortgage foreclosure.

The Debtors also argue that the standard articulated in <u>Great Western</u> supports their right to rescission by rejecting a broad application of the "inextricably intertwined" prong of *Rooker-Feldman*.  (<u>See</u> Doc. #40, pp. 14-17).  Though each of the precedential decisions listed above were decided under the "inextricably intertwined" prong of the *Rooker-Feldman* analysis, this does not alter this Court's conclusion with regard to the Debtors' attempt to rescind.

In <u>Great Western</u> the Third Circuit Court of Appeals cautioned that reliance on the "inextricably intertwined" prong "has caused lower federal courts to apply *Rooker-Feldman* too broadly."  <u>Great Western</u>, 615 F.3d at 169-170.  In its analysis of the *Rooker-Feldman* doctrine, the Court in <u>Great Western</u> explained that the phrase "inextricably intertwined" has is only "a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil*." <u>Id.</u> at 170 (citing <u>Hoblock v. Albany County Board of Elections</u>, 422 F.3d 77 (2d Cir. 2005)).  The Court then explained that the phrase "does not create an additional legal test or expand the scope of Rooker-Feldman beyond challenges to state-court judgments." <u>Id.</u>  As a result, the court exchanged the "inextricably intertwined" language associated with *Rooker-Feldman* in favor of the four part test described above.

In seeking rescission of the Loan through the *Complaint*, it is clear that the Debtors are challenging the effect of a state court judgment and seeking its reversal regardless of the verbiage used to describe their attempt.  This Court has already described how all four elements outlined in <u>Great Western</u> have been satisfied.  Moreover, the United States District Court for the Western District of Pennsylvania has reached the identical conclusion under a similar set of facts when applying the same four factors from <u>Great Western</u>.  <u>See</u> <u>In re Iananni</u>, No. 10-55, 2010 WL 2104244, *8 (W.D. Pa. May 24, 2010) (holding that the debtor's attempt to void a sheriffs' sale pursuant to 11 U.S.C. §§ 544,

547 or 548 was barred by *Rooker-Feldman* under the four-part test articulated by the

United States Court of Appeals for the Second Circuit in <u>Hoblock v. Albany County Board</u>

<u>of Elections</u>, 422 F.3d 77 (2d Cir. 2005)).  The United States District Court for the Eastern

District of Pennsylvania also concluded after the entry of the <u>Great Western</u> opinion that

the "great weight of authority" continues to support the holding that *Rooker-Feldman* bars

lower federal courts from exercising jurisdiction over a plaintiff's claim for rescission

under TILA when such claim is asserted after the entry of a default judgment in mortgage

foreclosure.  <u>Perkins v. Beltway Capital, LLC</u>, 773 F. Supp. 2d 553, 559 (E.D. Pa. 2011).

Thus, the second category of claims seeking rescission of the Loan fit squarely

within the type of actions barred by *Rooker-Feldman*.  This Court is barred from exercising

jurisdiction over the Debtors' request to unwind the default judgment in mortgage

foreclosure entered in the State court.  As a result, the Debtors' cause of action for

rescission of the Loan must be dismissed.

## VI.  Failure to State a Claim Under Rule 12(b)(6)

This Court does maintain subject-matter jurisdiction over the third category of

claims asserted in Counts I, II, V, VI and VII.  This category consists of claims asserted

against JPMorgan for the alleged acts of JPMorgan occurring after the execution of the

Purchase Agreement.  As a result of the terms of the Purchase Agreement, JPMorgan is

the assignee of WaMu's mortgage obligations and is thus responsible for the servicing of

the mortgage loan created by the Refinancing.  (<u>See</u> Doc. #19, Exhibit "B", Article II,

Section 2.1) ("the Assuming Bank [JPMorgan] specifically assumes all mortgage servicing

rights and obligation of the Failed Bank [WaMu].").  This category of claims is not barred

by the FIRREA exhaustion requirement and is not barred by *Rooker-Feldman* because the

claims appear to complain of the alleged acts of JPMorgan in its capacity as a servicer of

the Loan.  Nevertheless, because each of these "claims" are not sufficiently plead, they must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

As a result of the convoluted nature of the Debtors' *Complaint*, it was originally difficult for this Court to discern exactly what claims are being asserted against JPMorgan directly.  From a fair reading of the *Complaint*, however, it appears that in Count I, the Debtors are alleging they suffered harm based on JPMorgan's failure to recognize and/or respect their rescission request.  (See *Complaint*, ¶¶ 60-62).  In Count II, the Debtors appear to allege that JPMorgan violated RESPA by failing "to provide proper corrections to the [Debtors'] mortgage" and by failing to produce eleven requested documents in response to their alleged QWR.[18]  (See id. ¶¶ 65-66).  Even taking all of the allegations in the *Complaint* as true, the Debtors have failed to adequately plead a claim for relief in this third category.

---

[18]  The Debtors also allege that they are entitled to recover for the alleged TILA and RESPA violations under the UTCPCL (Count 5) and that these alleged violations constitute a "breach of the implied covenant of fair dealing" (Count VI).  (See *Complaint*, ¶¶ 91, 95).  Both of the Debtors' allegation in Count V and Count VI are entirely without merit.  The United States Court of Appeals for the Third Circuit has held that assignees, who have not committed any direct wrongdoing, cannot be held liable under the UTPCPL.  Murphy v. FDIC, 408 Fed. Appw. 609, 611 (3d Cir. 2010) (*unpublished opinion*).  In the instant matter, the Debtors have failed to allege any direct wrongdoing by JPMorgan at the time of the Refinancing.  Additionally, the Debtors have failed to allege any "fraudulent or deceptive conduct" by JPMorgan regarding its response to the alleged QWR.  73 P.S. § 201-2(4)(xxi).  Similarly, to the extent such a cause of action is recognized in Pennsylvania, a plaintiff alleging a breach of the covenant of good faith must aver that they incurred damages based on a breach of specific provisions contained in a note and mortgage.  See Lorah v. SunTrust Mortgage., Inc., 2010 WL 5342738, *6 (E.D. Pa. Dec. 17, 2010) (citing Benchmark Group, Inc., v. Penn. Tank Lines, Inc., No. 07-2630, 2009 WL 943515 (E.D. Pa. Apr. 8, 2009)).  In the instant matter, the Debtors have neither referenced any specific provisions of the documents associated with the Refinancing, nor indicated how JPMorgan allegedly breached any such provision.  Thus, the Debtors' mere assertion that they are permitted damages under these alternate legal theories must be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  See 556 U.S. at 678 (Courts "are not bound to accept as true a legal conclusion couched as a factual allegation.") (quoting Twombly, 550 U.S. at 555).

The Debtors' have failed to state a claim based on JPMorgan's alleged failure to respect the Debtor's rescission request under TILA. The TILA provisions clearly provide that a mortgagor's right to rescind a loan is not impacted by the assignment of the loan. See 15 U.S.C. § 1641(c). Conversely, TILA does not provide for an award of damages against an assignee for failing to honor a mortgagor's rescission request. See, e.g., Dougal, 395 B.R. at 891 (citing Brodo v. Bankers Trust, 847 F. Supp. 353, (E.D. Pa. 1994)); Sherzer v. Homestar Mortgage Services, Civ. O. 07-5040, 2010 WL 1947042, *12 (E.D. Pa. May 7, 2010). As stated by the United States District Court for the Eastern District of Pennsylvania in Brodo v. Bankers Trust:

> While § 1641(c) [of TILA] provides that the right to rescind exists even against a creditor's assignee, § 1640(a) permits only a "creditor" to be held liable for a monetary penalty or an award of attorney's fees for a TILA violation. Neither § 1641 nor any other section provides for a statutory penalty or an award of attorney's fees to a plaintiff should an assignee fail to respond to a valid rescission notice.

Brodo, 847 F. Supp. at 359. Thus, because there is no plausible theory of recovery based on JPMorgan's alleged failure to recognize the Debtors' rescission request, they have failed to state a claim under Fed. R. Civ. P. 12(b)(6).

Under RESPA (Count II), the Debtors claim that they suffered harm because JPMorgan intentionally "failed to provide proper corrections to the [Debtors'] mortgage" and failed to produce eleven documents requested the Debtors' alleged QWR. (*Complaint*, ¶¶ 64, 66). Akin to the Debtors' third category claims asserted in Count I, the Debtors have failed to state a claim for relief as to the alleged RESPA violations. Though the *Complaint* generally alleges that the Debtors "lost an ascertainable amount of money" as a result of WaMu's conduct during the Refinancing, the Debtor's do not allege any pecuniary loss as a result of JPMorgan's conduct. This omission is fatal because to state a claim under RESPA, the Debtors must allege that JPMorgan's breach resulted in actual

damages.  See Jobe v. Bank of America, N.A., No. 10-cv-1710, 2011 WL 4738225, *5

(M.D. Pa. Oct. 6, 2011 ("[A]lleging a breach of RESPA duties alone does not state a claim

under RESPA. Plaintiffs must, at a minium also allege that the breach resulted in actual

damages.") (quoting Hutchinson v. Delaware Sav. Bank FSB, 410 F. Supp. 2d 374, 383

(D.N.J. 2006)).  Accordingly, the Debtors' second claim under RESPA must be dismissed

pursuant to Fed. R. Civ. P. 12(b)(6).[19]

## VII.  Derivative Standing to Assert Avoidance Actions

As previously discussed, the Debtors appear to argue two distinct theories of

recovery in Count IV.  At the July 29, 2011 hearing on the *Motion to Dismiss*, the Debtors

argued that their "544" claim was simply an alternate way of describing their right to

avoid JPMorgan's security interest in the Property if they were successful in rescinding

the Loan under TILA.  (See Audio Recording of Hearing Held in Courtroom D, July 29,

2011 (12:21 - 12:24 PM)).  In a later argument (only fully developed at the hearing on the

*Motion for Derivative Standing*), the Debtors insisted that in the event that their TILA

request for rescission was not successful, the avoidance action(s) alleged in Count IV

would allow them to get "back to" the merits of the other counts in the *Complaint*.  (See

Audio Recording of Hearing Held in Courtroom D September 7, 2011 (11:05 - 11:07 AM)).

Stated differently, the Debtors' revised theory appears to propose that if the Debtors are

permitted to "step into the shoes" of the Trustee, they may be able to avoid the foreclosure

---

[19]  Moreover, the alleged QWR may not actually be a "qualified written request"
pursuant to 12 U.S.C. § 2605(e), as the alleged QWR does not identify any purported errors
regarding JPMorgan's servicing of the Loan. (See *Complaint*, Exhibit "AH").  See also Ward v.
Security Atlantic Mortgage Electronic Registration Systems, Inc., No. 5:10-CV-119-F, 2012 WL
871119, *10 (E.D.N.C. March 14, 2012) (citing cases).  This Court need not accept as true any
allegations in the Debtors' *Complaint* that are contradicted by the exhibits attached to the
*Complaint*.  Sunquest Info. Sys. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 649 (W.D.
Pa. 1999) ("[I]n the event of a factual discrepancy between the pleading and the attached
exhibit, the exhibit controls.") (citing ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 n.8 (3d Cir.
1994)).

judgment based on the cause of action alleged in Count IV (either §§ 544, 547 or 548), and once the foreclosure judgment avoided, the Debtors may pursue their non-bankruptcy causes of action.

As a result of this evolving argument and the sloppy drafting of the *Complaint*, it is unclear to the Court whether the Debtors are seeking to exercise the avoidance powers of the Trustee to avoid JPMorgan's allegedly unperfected security interest in the Property pursuant to § 544(a)(3) or are pursuing a preference action against JPMorgan pursuant to § 547. In any event, the Debtors insist that they are permitted to step into the shoes of the Trustee to exercise the avoidance powers set forth in Chapter 5 of the bankruptcy Code. (*Complaint*, ¶¶ 83-87). JPMorgan and the Trustee disagree, however, insisting that only a <u>trustee</u> may exercise avoidance powers under Chapter 5 of the Bankruptcy Code. (<u>See</u> Doc. #18, pp. 15-16 and Doc. #57).

The Trustee and JPMorgan argue that the plain language of the Bankruptcy Code limits the ability to chapter 13 debtors to exercise the trustee's "strong arm" powers. Specifically, both parties argue that 11 U.S.C. §§ 544, 547 and 548 permit only the <u>trustee</u> to exercise avoidance powers. (<u>See</u> Doc. #18, p. 16, Doc. #57 , p. 7). The Trustee and JPMorgan further argue that in contrast to similar provisions governing cases filed under chapter 11 and chapter 12, 11 U.S.C. § 1303 does <u>not</u> confer the chapter 13 trustee's avoidance powers on the debtor. (<u>See</u> <u>id.</u>). Both JPMorgan and the Trustee also explain that no courts within the Third Circuit have ever recognized the ability of a chapter 13 debtor to exercise the trustee's "strong-arm" powers under 11 U.S.C. § 544. (<u>See</u> Doc. #57, p. 3; Doc. #58, pp. 2-3).

In her *Supplemental Brief in Support of the Trustee's Response to Debtors' Motion to Request Derivative Standing to Exercise Trustee's Powers,* the Trustee further insists that

in a prior case involving Debtor's Counsel, In re Weyandt, the United States District Court

for the Western District of Pennsylvania ruled "that previous Third Circuit precedent

foreclosed the debtor's attempt to use the Trustee's avoidance power." (Doc. #60,

unnumbered pp. 2-3).

A.

This Court stops short of the concluding that there exists a *per se* rule in chapter

13 cases against any party other than a trustee from exercising the Chapter 5 avoidance

powers on a derivative basis.  The Court reaches this conclusion because the Third

Circuit in In re Knapper, 407 F.3d 573 (3d Cir. 2005) did not squarely address the issue

of derivative standing in bankruptcy.  Rather, in Knapper the Third Circuit Court of

Appeals stated that a chapter 13 debtor does not have standing in his or her own right

to bring avoidance actions in bankruptcy. Knapper, 407 F.3d at 583.  The Third Circuit's

decision was particularly acute under the facts of that case because the cause of action

would result in no demonstrable benefit to the creditors of the bankruptcy estate. Id.

The Third Circuit Court of Appeals has had the occasion to weigh-in on the issue

of derivative standing in bankruptcy.  In  Official Comm. of Unsecured Creditors of

Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery (In re Cybergenics), 330 F.3d 548

(3d Cir. 2003), the United States Court of Appeals for the Third Circuit held that, upon

appropriate application to the court, bankruptcy courts have the equitable power to

imbue  a creditors' committee in a chapter 11 bankruptcy case with standing to sue to

avoid a fraudulent transfer for the benefit of the bankruptcy estate.  Cybergenics, 330

F.3d at 580.  While Cybergenics was a chapter 11 case and involved a creditor's

committee, this Court sees no reason why it should not apply equally as well to debtors

in the chapter 13 context.  Stated in other words, if as a legal matter a Chapter 5 cause

of action would inure to the benefit of the bankruptcy estate, and if the chapter 13 trustee doesn't pursue it, why should a party-in-interest like the debtor be precluded from pursuing the cause of action on a derivative basis?  The Court really has not received a satisfactory answer to this question.

Because <u>Knapper</u> did not address the concept of derivative standing, this Court concludes that the Third Circuit's opinion in <u>Cybergenics</u>, and not <u>Knapper</u>, governs the analysis of whether or not the Debtors in the instant matter should be able to pursue Chapter 5 claims on behalf of the estate when the Trustee refuses to do so.

 Based on the theory that <u>Cybergenics</u> can be applied in the chapter 13 context, the Debtors encourage this Court to apply a three part test from <u>Official Comm. of Unsecured Creditors v. Clark (In re National Forge Co.)</u>, 326 B.R. 532 (W.D. Pa. 2005), to determine that a grant of derivative standing is appropriate in the instant matter.  In <u>National Forge</u>, the United States District Court for the Western District of Pennsylvania found that a party could obtain derivative standing to bring a cause of action under § 544 of the Bankruptcy Code if three conditions are present: (i) the movant has alleged a colorable claim that would benefit the estate (ii) the trustee has unjustifiably refused to pursue the claim itself; and (iii) the movant has obtained permission from the bankruptcy court to initiate the action on behalf of the estate.  <u>Id.</u> at 543 (citations omitted).

In the instant matter, it appears to the Court that the Debtors have failed at the first element set forth in <u>National Forge</u>.  Even accepting as true the averments of the Debtors in support of their § 544(a)(3) and/or "preference" action, the Debtors have not

asserted a "colorable claim," let alone demonstrated how such claim would benefit the creditors of the estate as a whole.[20]

1.

Section 544(a)(3) of the Bankruptcy Code provides that a trustee "may avoid any transfer of property of the debtor" that would be avoidable by a "bona fide purchaser of real property . . . at the time of the commencement of the case . . . ." 11 U.S.C. § 544. A generous reading of the *Complaint* reveals that the Debtors allege they may avoid JPMorgan's claim against the estate because JPMorgan "does not hold any interest in either the [Debtors'] note or the [Debtors'] mortgage." (*Complaint*, ¶ 84). Beyond the fact that the *Complaint* does not make it clear what, if any, "transfer" the Debtors are seeking to avoid, the allegations in Count IV do not give rise to a "colorable claim." The bald assertion in the *Complaint* that JPMorgan does not hold any interest in the note or mortgage is simply a legal conclusion that this Court need not accept. See Iqbal, 556 at 678 (courts "are not bound to accept as true a legal conclusion couched as a factual allegation.") (quoting Twombly, 550 U.S. at 555).

Moreover, this allegation is directly contradicted by judicially noticed exhibits and the statements of Debtors' Counsel at the hearing in the *Motion to Dismiss*. The Debtors'

---

[20] This Court is also not convinced that the pursuit of Count IV would benefit the bankruptcy estate. Even if the Debtor were permitted to use the trustee's powers to avoid the judgment in mortgage foreclosure, JPMorgan would still have a lien on the Property. Therefore, the Debtors would need to pursue their TILA claim for rescission. The Debtors claim that "avoiding" their mortgage in this manner would allow for substantial repayment to unsecured creditors because of the requirements of the liquidation alternative test, or through the creation of an unencumbered asset (the Property) that could be liquidated for the benefit of creditors. (See Doc. #39, ¶ 21). Each of these contemplated "benefits" hinges on the assumption that the Debtors would hold the Property free and clear following rescission of the Loan under TILA. Contrary to the Debtors' stated belief, TILA would require that the Debtors either tender the Property or the "reasonable value" of the Property to JPMorgan following a successful request to rescind. See 15 U.S.C. § 1635(b). Thus, even ignoring litigation costs, this Court does not see how pursuit for the avoidance action with the ultimate objective of rescinding the Loan would benefit the bankruptcy estate.

repeated acknowledgment that the state court judgment in mortgage foreclosure was entered in favor of JPMorgan <u>prior</u> to the filing of their bankruptcy case is uncontroverted evidence that JPMorgan absolutely had an "interest" in the Property "as of the commencement of the case . . . ." 11 U.S.C. § 544. (<u>See</u> <u>also</u> Doc. #18, Exhibit "A", Doc. #40, pp. 3-4).

Additionally, Counsel for the Debtors expressly stated at the July 29, 2011 hearing on the *Motion to Dismiss* that "we're not debating whether, for example, JPMorgan is the holder of the Debtors' note [and presumably the mortgage as well], . . . we're not debating that. That's, there is no allegations here that JPMorgan does not hold the Debtors' note because they purchased it and the Purchase Agreement speaks for itself." (<u>See</u> Audio Recording of Hearing Held in Courtroom D, July 29, 2011 (12:21 - 12:23 PM)). Aside from directly contracting the allegations in the Debtors' *Complaint*,[21] this statement leaves the Debtors without any basis for asserting a § 544 action absent rescission of the Loan under TILA. In sum, it is clear that JPMorgan's interest in the Property was conclusively established prior to the "commencement of the case" and, therefore, the Debtors have not asserted a colorable claim under § 544(a)(3).

<u>2.</u>

While titled as a 544(a)(3) action, the Debtors later appear to assert that the judgement in mortgage foreclosure can be avoided as a "preference." (<u>See</u> Audio Recording of Hearing Held in Courtroom D, September 7, 2011 (11:06 - 11:08 AM)). Pursuant to § 547 of the Bankruptcy Code the trustee may avoid a transfer of an interest of the debtor

---

[21] Paragraphs 84 and 85 of the Debtors' *Complaint* expressly state in pertinent part: "Chase is not a true party in interest as Chase does not hold any interest in either the Plaintiffs' note or the Plaintiffs' mortgage. Because Chase does not own the Debtor's *[sic]* note it cannot hold a perfected security interest in the Debtors' property and it may not have a claim against the Debtors' estate." (*Complaint*, ¶¶ 84-85).

in property: (1) made to or for the benefit of a creditor, (2) on account of an antecedent debt, (3) made while the debtors was insolvent, (4) within ninety (90) days prior to the filing, (5) that enabled the alleged recipient of the preferential transfer to receive more than it would have received in a hypothetical chapter 7 liquidation.  See 11 U.S.C. § 547(b).  Looking only at the language in the *Complaint*, the Debtors have failed to allege any of the elements of a "preference" action and, therefore, the Debtors have failed to state a colorable claim under 11 U.S.C. § 547.[22]  Even assuming that Debtors were to successfully amend the *Complaint*, the "preference" action would fail because there does not appear to be a "transfer" that has occurred within the preference period.[23]

The Debtors nonetheless argue that there was a preferential "transfer" because included in the definition of a transfer under the Bankruptcy Code is "the foreclosure of the debtor's equity of redemption."  11 U.S.C. § 101(54)(c).  However, under Pennsylvania law, "the foreclosure of the debtor's equity of redemption" does not occur until the "the hammer falls" at the foreclosure sale.[24]  See In re Brown, 311 B.R. 721, 724 (Bankr. W.D. Pa. 2004) (citing Davis v. Suntrust Mortg. (In re Davis), 281 B.R. 626, 633 (Bankr. W.D.

---

[22]  Similarly, the *Complaint* does not allege a "fraudulent transfer" pursuant to 11 U.S.C. § 548.

[23]  The Debtors' preference claim also appears to fail because the Debtors' cannot allege that JPMorgan has received more than it would have under a hypothetical chapter 7 liquidation.  Indeed, it appears that JPMorgan has not yet received any assets in satisfaction of its lien solely as the result of the mortgage foreclosure.  Once the foreclosure is complete JPMorgan could be repaid by taking title to the Property or by selling title to the Property; however, neither of these events has yet occurred.  Thus, as the Debtors cannot allege that JPMorgan has received any value in excess of the amount it would have received in a hypothetical chapter 7 liquidation, the Debtors' have failed to state a colorable claim for a preference under 11 U.S.C. § 547.  Electra Lighting & Elec. Co. v. S & T Bank (In re Free), 449 B.R. 461, 466 (Bankr. W.D. Pa. 2011).

[24]  In other words, the Debtors retain their "right to redeem" pursuant to 41 P.S. § 404 until a sheriffs sale of the Property occurs.  See, e.g., In re Townsville, 268 B.R. 95, 118 (Bankr. E.D. Pa. 2001),  Marx Realty & Improv. Co. v. Boulevard Center, Inc., 156 A.2d 827, 829 (Pa. 1959).

00007488.WPD                                    -40-

Pa. 2002)).  Therefore, the only "transfer" with regard to the Debtors' interest in the

Property occurred when the Debtors secured refinancing on October 26, 2007, creating

the lien in favor of WaMu.  See Funches v. Household Fin. Consumer Disc. Co. (In re

Funches), 381 B.R. 471, 497 (Bankr. E.D. Pa. 2008); see also 11 U.S.C. § 101(54)(A) (the

definition of "transfer" includes "the creation of a lien").  As such, the entry of the

judgment in mortgage foreclosure would not somehow effect a further transfer of the

Debtors' interest in the Property.  Funches, 381 B.R. at 497.  Thus, the Debtors' have

failed to alleged a colorable claim for a preference as the only material transfer of the

Property took place well outside the ninety day preference period.

As the Debtors' "544(A)(3) PREFERENCE" claim appears to be entirely void of merit,

this Court cannot find that the Trustee has "unjustifiably refused" to pursue the claim.[25]

As a result, the Court will not give permission for the Debtors to initiate an action on

behalf of the Debtors' estate.  Thus, even absent a *per se* bar to a chapter 13 debtor's

attempt to exercise the avoidance powers of the trustee under §§ 544, 547 and/or 548,

the Debtors have failed to demonstrate they are entitled to derivative standing because

they have not put forth a colorable claim.

## B.

As a final matter, in the *Supplemental Brief in Support of Trustee's Response to

Debtors' Motion to Request Derivative Standing to Exercise Trustee's Powers*, the Trustee

requests that Counsel to the Debtors be found to be in violation of Pennsylvania Rule of

Professional Conduct 3.3.  (See Doc. #60, unnumbered p. 6).  This rule states, in

pertinent part, that a lawyer shall not knowingly "fail to disclose to the tribunal legal

---

[25]  Additionally, the Debtors admit that they never made any formal request that the
Trustee pursue this cause of action.  (See Doc. #40, pp. 26-28).

authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . ." Rules of Prof. Conduct, Rule 3.3(a)(2), 42 Pa. C.S.A.

In support of its request, the Trustee points to Counsel's failure to disclose legal authority contrary to his position with regard to the derivative standing issue. (See id. at unnumbered pp. 2-5). Specifically, the Trustee cites In re Knapper, 407 F.3d 573 (3d Cir. 2005), In re Iannini, No. 10-55, 2010 WL 2104244 (W.D. Pa. May 24, 2010), and an unpublished opinion from a case in which Counsel for the Debtors participated as counsel for the debtor, Weyandt v. Federal Home Loan Mortgage Corporation, No. 2:11-cv-00957, Doc. #11. The Court notes that of these cases, only Weyandt squarely rejects the concept of derivative standing for chapter 13 debtors.

A review of the record, however, reveals that both Knapper and Iannini were cited by JPMorgan and the Trustee (see Doc. #18 p. 5; Doc. #57, pp. 4-6; Doc. #58, pp. 2-5), and were therefore known to opposing counsel. In addition, the chapter 13 trustee was well aware of Weyandt as she was the chapter 13 trustee in that case, and that case was decided by the District Court after the instant case was briefed by the parties. These circumstances militate against sanctioning Debtors' counsel at this time. The Court nonetheless reminds Counsel of his duty to supplement the record and disclose potentially adverse authority. The Court also cautions Counsel to be more candid in the future or sanctions may be imposed.

In addition to raising Rule 3.3(a)(2) issues, the Trustee's remaining concerns regarding Counsel's quixotic pursuit of this adversary proceeding are well taken. As stated by the Untied States Court of Appeals for the Third Circuit in Cybergenics, the policy reason for channeling avoidance actions through the trustee is so that the trustee

may act as a "gatekeeper" to prevent "independent avoidance actions . . . that might prejudice the estate. . . ." Cybergenics, 330 F.3d at 568. The instant adversary proceeding is an example of when a certain amount of gatekeeping, by either the Trustee or the Bankruptcy Court is necessary, to prevent misguided adversary actions from progressing to the point where large amounts of fees are incurred without any reasonable expectation of benefit to the bankruptcy estate.

This Court is also concerned about several other issues arising from Counsel's prosecution of the instant adversary proceeding. For example, Counsel advanced several theories in both the *Complaint* and during subsequent hearings that do not appear to have any adequate basis. The Court is also troubled by Counsel's shifting theories of recovery, which have resulted in conflicting averments from Counsel concerning the action plead in Count IV– that is, the "544(a)(3) PREFERENCE" cause of action. The *Complaint* itself generally reflects a "shotgun" approach to pleading which, as set forth above in this *Memorandum Opinion*, made it extremely difficult for the named defendants (and this Court) to decipher the allegations contained therein. Finally, another deficiency by Counsel was his decision to omit from the *Complaint* the fact that a default judgment in mortgage foreclosure had been entered prior to the filing of the Debtors' chapter 13 case. Certainly this is a fact that is very germane and dispositive to the outcome of this lawsuit.

This Court cautions Counsel against repeating some of the behaviors and habits displayed thus far in this adversary proceeding. The Court reminds Counsel of his continuing ethical obligations under Fed. R. Bankr. P. 9011(b) and of the penalties under 28 U.S.C. § 1927 for "unreasonably" and "vexatiously" multiplying proceedings in a case. See In re Anctil Plumbing & Mech. Contrs., Inc., 416 B.R. 333 (Bankr. D. Mass. 2009)

00007488.WPD                                    -43-

(sanctioning debtor-in-possession attorney for continuing to raise the same argument contrary to established precedent). While no sanctions are being imposed at this time, the Court expects Counsel to govern himself accordingly in the future.

### VIII.  Conclusion

The Debtors' claims for damages in Counts I, II, V, VI and VII against JPMorgan for the acts and/or omissions of WaMu or other entities occurring prior to the execution of the Purchase Agreement are subject to the FIRREA exhaustion requirement. As the Debtors have not exhausted the administrative remedies under FIRREA, this Court does not have subject-matter jurisdiction over this first group of claims. Similarly, pursuant to the *Rooker-Feldman* doctrine, this Court may not exercise subject-matter jurisdiction over the Debtors' TILA claim of rescission following the entry of the judgment in mortgage foreclosure by the state court.

This Court does maintain subject-matter jurisdiction over the remaining claims under Counts I, II, V and VI for the alleged acts of JPMorgan in its capacity as a servicer of the Debtors' mortgage. However, the Debtors have failed to state a viable cause of action for each of the claims alleged, and, thus, these claims will be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) (applicable in adversary proceedings though Fed. R. Bankr. P. 7012). Finally, as the Debtors lack standing to exercise the avoidance powers of the Trustee, Count IV of the *Complaint* must also be dismissed.

As a result, this Court will enter an order granting *Defendant JPMorgan Chase Bank, N.A.'s Motion to Dismiss Plaintiffs' Complaint*. The Court will also enter an order granting *Defendant JP Morgan Chase Bank, N.A.'s Request for Judicial Notice in Support of Motion to Dismiss Plaintiff's Complaint*.

00007488.WPD

-44-

The Court will also deny the Debtors' *Motion to Request Derivative Standing to Exercise Trustee's Powers Under §§ 544, 547, and 548 Nunc Pro Tunc* filed at Doc. #65 in the main case, and grant the *Trustee's Motion to Strike Debtors' Motion to Request Derivative Standing to Exercise Trustee's Powers Under §§ 544, 547, 548 Nunc Pro Tunc* as the Debtors' incorrectly filed a duplicate copy of their *Motion for Derivative Standing* in the Adversary Proceeding at Doc. #39.

**Dated**:   May 21, 2012               /s/ Jeffery A. Deller
                                **JEFFERY A. DELLER**
                                U.S. Bankruptcy Judge

**CASE ADMINISTRATOR TO SERVE:**
        David A. Colecchia, Esq.
        Gary J. Gaertner, Esq.
        James McNally, Esq.
        Joshua D. Baker, Esq.
        Ronda J. Winnecour, Chapter 13 Trustee
        Office of the United States Trustee